OPINION OF THE COURT
Daniel F. McMahon, J.
A combined Huntley and Wade hearing was held on this six-count indictment which charges defendant with the crimes of murder, kidnapping and weapon possession, charges allegedly committed on April 21, 1977 and involving the death of one Annibal Torres Rivera. Defendant has also been charged in three other indictments with murders committed on April 24, 1977, May 20, 1977 and June 30, 1977. The hearings in the instant case were commenced on October 12, *660 1978 and continued on October 13, 16, and 17, 1978. The People called Detectives John Taldone, Ronald Marsenison, John McCann and John Meda (all of the 8th Homicide Zone) and civilian witnesses Iris Guzman, Nilza Olivero and Raymond Olivero. The defendant called Jack Levy (managing agent of an apartment complex known as Stevenson Commons), Leonard Beauchamp, Jr. (defendant’s brother), and Luiz Maria Martinez (referred to at times as defendant’s common-law wife and in whose apartment defendant was found at the time of his arrest). The following credible evidence was adduced at the hearing:
Various detectives assigned to the 8th Homicide Zone commenced their investigations following the discovery of the several victims of these homicides. On September 9, 1977, Detective Taldone (who had been specifically assigned the investigation of the death of one George Mullin [also known as "Fat Pete”], the subject of Indictment No. 1922/77 allegedly committed on May 20, 1977) was called to the New York State Police Barracks at Stony Point in Rockland County, New York, for the purpose of interviewing one Raymond Olivero in connection with that homicide. The Rockland County authorities were involved in the instant homicide as the body of Annibal Rivera was discovered near a restaurant in that county. Olivero, who testified concerning the Wade issue at this hearing, was named as a defendant in two of the murder indictments involving defendant Colon (he has pleaded to manslaughter in the second degree and received a promise of probation on both indictments). During his conversation with Olivero, Detective Taldone learned for the first time of defendant Colon’s name and his alleged participation in the murder of Annibal Rivera.
Detective John Meda was in charge of the Annibal Rivera homicide investigation. After conferring with Detective Taldone following the latter’s interview with Olivero, Detective Meda met with Raymond Olivero on September 13, 1977 (or Sept. 10, 1977, according to Taldone’s recollection) at the Rockland County Courthouse. Detectives Marsenison and Taldone and Assistant District Attorneys Moore and Griffith and defense attorneys Barone and Fitzgerald (representing Olivero in the indictments against him) were also present. Detective Meda showed Olivero five photographs. Olivero identified four of the persons depicted in the photographs; he could not identify the fifth individual. On September 21, 1977 a single *661 police mug shot of defendant was shown to Iris Guzman and Nilza Olivero at the Sheraton Inn in Rockland County. On September 27, 1977, Detective Taldone showed Raymond Olivero a photographic display which he had prepared containing eight pictures attached to one side of a manila folder; the array was exhibited at the 8th Homicide Zone office at the 43d Precinct and at Assistant District Attorney Moore’s office at the Bronx Courthouse. Olivero identified defendant as well as other persons purportedly involved in these homicides.
In the early part of December, 1977, Detective McCann placed a Wackenhut transmitter (a "beeper” tracking device) on the undercarriage of an automobile owned by defendant’s brother, one Leonard Beauchamp. The Beauchamp vehicle was located in a parking lot adjacent to the Stevenson Commons apartment complex in The Bronx. The police had information which led them to believe that Colon was hiding out in the nearby New Jersey area but they had no details concerning his precise location. During the next week or so, Detective McCann had to change the batteries on the Wackenhut on two occasions and at about 3:00 a.m. on December 15, 1977 he changed the entire transmitter on the Beauchamp vehicle. The car was at all times located in the afore-mentioned parking lot which contains about 500 cars in three adjacent lots. It is surrounded by an eight-foot chain link fence with only one opening which has an electronic lock which can be opened from the outside by a key. Detective McCann was unsure if he had to scale the fence in the early morning hours of December 15 in order to enter the parking lot — but, in any event, he used that method on at least one occasion to service the beeper. The movements of the Beauchamp vehicle were kept under observation during the daylight hours of December 15 by Detective McCann who was using the receiving end of the Wackenhut unit. During most of that time he traced the vehicle from a police helicopter. On numerous times visual contact of the Beauchamp car was lost during that day. In the evening Detective McCann resumed his vigil (with the receiver) in an unmarked patrol car. Later that evening the car was followed visually and by use of the Wackenhut to an apartment house at 211 48th Street, Union City, New Jersey.
As midnight approached, various law enforcement members of the F.B.I., D.E.A., 8th Homicide Zone and local police officers took up positions around and in the apartment house. Detectives Marsenison, Meda and F.B.I. Agent McLaughlin *662 managed to ascertain that defendant was present in apartment 4-D. A key to that apartment was obtained. Shortly after midnight, Detective Marsenison knocked on the door, announced "police” in English and Spanish and directed defendant, by name, to put up his hands. Detective Meda opened the lock with the key and pushed in the door. Defendant had his hands in the air as had been directed. There was no resistance. Detectives Meda, Marsenison and Agent McLaughlin were the first to enter. There were about a dozen additional officers in the immediate vicinity armed with shotguns and handguns. The police found defendant, a woman (they assumed was his wife) and a small infant in the apartment. Defendant was handcuffed and asked if he had any weapons. He replied in the negative. A weapons search of defendant’s person and the immediate area of the apartment was negative.
Detective Marsenison orally advised defendant of certain Miranda warnings — but in reciting these warnings in court on two occasions he failed to refer to the fact that any statements made by defendant could be used against him in a court of law. Defendant acknowledged he understood his rights and stated he would get an attorney. Detective Marsenison told defendant he was under arrest for several murders committed in New York. He did not specify any particular victims or refer to the fact he had been indicted. Defendant challenged Detective Marsenison’s right to be there (referring to the fact that they were in New Jersey). Detective Marsenison replied that they were there pursuant to Federal fugitive warrants as well as New York State arrest warrants.
The officers stayed with defendant in the apartment for approximately one-half to one hour. Defendant was then taken outside to a Federally owned and operated carry-all type van. Defendant was to be taken to the Metropolitan Corrections Center for processing under the Federal warrant. (He was booked on the New York charges the following day by Detective Meda.) Agent McLaughlin sat in the right front side; another Federal agent drove the van. Defendant sat in the seat in the rear between Detectives Marsenison and Meda. As the van was about to move, defendant asked where he was going. The detectives replied that he was being taken to Metropolitan Corrections Center; they told him its location. Defendant then asked the two detectives why they were looking for him so hard as the "bad” people that he had taken *663 care of were the same the police officers wanted. Detective Marsenison said that they were looking for him all over the place. Defendant replied "that he was around”. The detectives then began to hum a song called "Guadalahara”. Defendant smiled. (The police investigation had previously revealed that for several months defendant had been traveling in various places in Mexico.) The conversation in the van took place within a few blocks from the 411 48th Street area.
Leonard Beauchamp, Jr., defendant’s brother, and Luiz Maria Martinez testified on defendant’s behalf, primarily concerning alleged police brutality. Both were obviously witnesses interested in giving testimony favorable to the defense. Mr. Beauchamp related how he left his parking lot at Stevenson Cummons in his 1975 Camaro (containing the Wackenhut unit) on the evening of December 15, 1977, arriving at his brother’s hideout at approximately 10:00 to 10:30 p.m.; that he spoke with his brother and his "sister-in-law” on two rather brief occasions in her apartment at 211 48th Street; that approximately one-half hour after arriving in the area he was met by the police who searched him; that he was asked by Detective McCann if he knew Armando Colon to which he replied, "no”; that he was then struck in the head by a gun by Detective McCann and punched over his body, head and neck; that he was then handcuffed and taken to apartment 4-D where he saw his brother sitting on the floor with his hands cuffed behind him; that the police threatened his brother and wife if Colon refused to confess; that his brother was moved to a bedroom; that he then heard "moans and thumps” coming from that direction. On cross-examination he admitted that he had lied to Detective McCann when he denied knowing his brother and that he knew the police were looking for him for parole violations. He stated that he saw bruises on his brother’s body but could not recall seeing any on his face.
Miss Martinez had moved to her apartment (4-D) one week prior to the arrest. She first met defendant in the fall of 1976 (three months after his release on parole). The police referred to her as defendant’s "wife”. Defendant had been with her at the apartment for about three days. She testified that one of the officers pulled Colon outside the apartment and struck him; that he was later handcuffed, pushed to the floor (striking his head) and kicked while on the floor. She claims that she had been pushed hard; that Colon had been threatened by the police if he did not confess to 23 murders and she was *664 taken into the bathroom and questioned about her association with defendant. She denied any abuse while being questioned there..
STATEMENTS BY COLON
Defendant urges, at the outset, that all statements allegedly made by him, following his arrest in Union City, New Jersey, must be suppressed as the illegal "fruit” of placement and use of the Wackenhut transmitter on his brother’s car, resulting in his apprehension and arrest. More specifically, defendant contends that the use of the Wackenhut was a violation of his Fourth Amendment rights in the absence of any court order; that the transmitter was first attached to Leonard Beau-champ’s vehicle while in a private parking lot, for which he paid a monthly parking fee; that his car was also in the parking lot on the two other occasions (during a span of approximately one week) when the batteries and the entire transmitter were replaced; that the lot was surrounded by fencing with a minimum height of eight feet; that during the tracking of Leonard Beauchamp’s car on December 15, 1977 the authorities frequently lost visual contact and would not have located defendant in Union City that evening without the use of the tracking device.
The District Attorney contends that there was no violation of the Fourth Amendment; that under all of the facts and circumstances use of the Wackenhut was "reasonable”; that at most there was a "minimal intrusion” solely to Leonard Beauchamp’s rights; that defendant had no proprietary interest in his brother’s car, the parking lot in question or apartment 4-D at 211 48th Street, Union City; that defendant has no standing to claim any Fourth Amendment violation. The District Attorney further stated that the transmitter was placed on Leonard Beauchamp’s car merely in the "hope” that it would eventually lead to Armando Colon (there was no testimony adduced at the hearing concerning any known specific police leads through the brother to the defendant).
Defendant’s attorney has placed much reliance upon Katz v United States (389 US 347) in which the Supreme Court held that the F.B.I.’s warrantless placing of an electronic listening and recording device on the outside of a public telephone booth was a Fourth Amendment violation to the defendant who had made telephone calls from the booth; the court held the use of such devices to be, in fact, a "search and seizure” *665 even though the booth was accessible to the public and there was no physical invasion involved. Katz restated Fourth Amendment rights in terms of protecting "people not places”. Defendant contends that the Katz principle applies to the facts at bar. This court does not agree.
The precise question as to whether the use of an electronic "beeper” for tracking purposes falls under the Fourth Amendment doctrine has been considered in several Federal cases. No specific New York cases in point were submitted by the respective attorneys and the court’s research has failed to reveal any authoritative New York law on this subject. In the United States v Holmes (521 F2d 859) a three-Judge court determined that the placement of a "beeper” unit under a van without court order was in contravention of Fourth Amendment rights and that some of the defendants therein had been thus subjected to an unconstitutional search and seizure (while finding that other defendants had no "standing” under Jones v United States [362 US 257]). Because of the obvious importance of such a decision that opinion was withdrawn and the court agreed en banc to a rehearing before all 16 Judges of the Fifth Circuit. The full court rendered its en banc decision on August 8, 1976 (537 F2d 227). In its decision eight of the Judges affirmed the District Court’s finding of a Fourth Amendment violation, writing a short Per Curiam opinion; the other eight Judges dissented concerning the Fourth Amendment question. Hence, there was an equally divided bench on the constitutional question. The "dissenting” opinion urged persuasively that such a "beeper” might be utilized without court order where there was "reasonable suspicion or probable cause” and that the installation of the "beeper” in that case "was only a minimal intrusion” (p 229). The dissenting opinion further cited Cardwell v Lewis (417 US 583) where the Supreme Court found no Fourth Amendment violation in an examination of defendant’s automobile and taking of paint scrapings from its exterior while it was in a public lot, quoting the following language (p 229): "[W]e fail to comprehend what expectation of privacy was infringed.’ ” And: " 'The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one’s person or of a building.’ Almeida-Sanchez v. United States, 413 U. S. 266, 279, 93 S. Ct. 2535, 2542, 37 L.Ed.2d 596 (1973) (Powell, J., concurring). One has a lesser expectation of privacy in a motor vehicle because its function is transportation *666 and it seldom serves as one’s residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view.”
The dissenting decision also cited a Federal Court of Appeals case and two District Court cases involving electronic tracking devices: United States v Perez (526 F2d 859); United States v Martyniuk (395 F Supp 42); and United States v Carpenter (403 F Supp 361); quoting language in the Carpenter case (p 231) " '[t]he procedure used here is far less an intrusion than wire tapping or bugging’ ”.
On July 26, 1976, (shortly prior to the Fifth Circuit en banc affirmance by the equally divided court in Holmes) the 9th Circuit Court of Appeals rendered its unanimous decision on the same constitutional issue. (United States v Hufford, 539 F2d 32.) In Hufford, there had been an initial installation of an electronic "beeper” without court order coupled with subsequent use of other beepers pursuant to court orders. The court unanimously concluded under all the facts that the use of the beeper both with and without court order was not in violation of defendant’s Fourth Amendment rights; that the initial installation was (p 33) "a probing, exploratory quest for evidence” and that "defendant did not have a reasonable expectation of privacy” citing Katz (supra); that defendant "did not have a reasonable expectation of privacy as he drove along the public road”; that (p 34) "the device only augments that which can be done by visual surveillance alone”, and that there was no Fourth Amendment violation but rather a situation analogous to other "surveillance devices”, such as binoculars, tracking dogs and searchlights. (See People v Spinelli, 35 NY2d 77, n, at p 81; United States v Thomas, 551 F2d 347.) Hufford also analogizes a "beeper” case to that of a "bugged-informer” situation, citing Lopez v United States (373 US 427), as reaffirmed in United States v White (401 US 745).
This court concurs with the reasoning reached in Hufford and by the "dissenters” in Holmes. The use of a "beeper” type tracking device is clearly distinguishable from wiretapping or illegal eavesdropping, which latter devices are intended to overhear and/or record private conversations. The "beeper” is merely an aid in a surveillance operation. Obviously, the question as to whether its placement in a given case is proper can only be determined by a consideration of all the facts and by reaching a determination as to "reasonableness”. Where *667 there is a necessary degree of such "reasonableness”, there is no inflexible requirement that a search warrant (as would generally be required under a Fourth Amendment situation) be first obtained. Indeed, there are many instances, such as the instant case, where the known facts would not support the issuance of a search warrant. The court finds the Hufford opinion legally persuasive and fundamentally sound. As our New York Court of Appeals stated in People v Du Bour (40 NY2d 210, 222-223): "In evaluating the police action we must consider whether or not it was justified in its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible (People v Cantor, 36 NY2d 106, 111). We bear in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence. The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality.”
In the instant case, law enforcement officials were concerned with five brutal homicides committed over a few months in the spring of 1977; there were exhaustive efforts and investigations by law enforcement officials, Federal and State, continuing over a period of many months and resulting in the indictment of defendant Colon (among others) on three murder indictments (Oct. 5, 1977) and a single murder indictment (Nov. 28, 1977). Despite maximum efforts by all the combined authorities, they had been unable to execute the Federal fugitive warrants and/or the New York State arrest warrants as Colon’s precise whereabouts could not be ascertained. The police were under a duty and obligation to use all reasonable efforts to locate, apprehend and arrest defendant on these charges. He was, in fact, hiding out in the State of New Jersey at the time of his arrest and had been traveling in Mexico that fall. The placement of the Wackenhut on the undercarriage of the defendant’s brother’s vehicle was a "reasonable” attempt to locate Colon’s hideaway.
Under all of these circumstances there was at the very most a "minimal intrusion” as to Leonard Beauchamp; there was little or no personal intrusion as to defendant. It is true that the Beauchamp vehicle was parked in a private outside park *668 ing lot, for which he paid a monthly rent; that the parking area was surrounded by fencing and, on at least one occasion, Detective McCann had to scale the fence to maintain or replace the transmitting device under the car. This area might be classified as curtilage of Beauchamp’s apartment. (See People v Farenga, 42 NY2d 1092; People v Buggenhagen, 57 AD2d 466.) However, there was at no time any "search” or opening or unlocking of any part of the Beauchamp vehicle. There was no eavesdropping of conversations in the vehicle. Defendant Colon had no proprietary interest in his brother’s vehicle, the parking lot, or the apartment in which he was located and arrested when his brother’s car was tracked to the immediate area. The "intrusion” was amply justified in this case. Furthermore, defendant has no "standing” to complain of any purported Fourth Amendment violation to his brother Leonard. (Simmons v United States, 390 US 377, 389-390; see People v Huntley, 43 NY2d 175.) Hence, the court concludes that there is no blanket proscription to any and all statements purportedly made by defendant following his arrest by reason of the installation and use of the Wackenhut equipment.
[Portions of opinion omitted for purposes of publication.]